

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEOPOST INDUSTRIE B.V., | ) | |
| NEOPOST, INC., NEOPOST S.A., | ) | |
| and HASLER, INC. | ) | |
| | ) | No. 04 C 5047 |
| Plaintiffs, | ) | |
| | ) | Judge Ruben Castillo |
| v. | ) | |
| | ) | |
| PFE INTERNATIONAL, INC. and | ) | |
| PFE INTERNATIONAL LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Neopost Industrie B.V., Neopost, Inc., Neopost S.A, and Hasler, Inc. (collectively, "Neopost") sued PFE International, Inc., and PFE International Limited (collectively, "PFE") alleging that PFE's production and marketing of certain mail assembly and processing products violate certain of Neopost's Patents and trademarks. Neopost alleges that two PFE machines—the Minimailer 4 Plus and the Maximailer - violate U.S. Patent numbers 5,339,603 ("the '603 Patent") and 6,481,704 ("the '704 Patent"). On September 12, 2005, this Court held a bench trial at which Neopost presented its case-in-chief on all issues of liability under its Second Amended Complaint ("Complaint"). At the conclusion of Neopost's case-in-chief, PFE moved for judgment as a matter of law under Federal Rule of Civil Procedure 52(c) on Neopost's trademark and patent claims. The Court gave the parties the opportunity to fully brief the motions. After carefully considering those briefs and the evidence presented at trial, the Court makes the following findings of facts and conclusions of law in accordance with Rule 52(c), granting both of PFE's motions in their entirety, and thus completely dismissing Neopost's trademark and patent claims.

Pursuant to Rule 52, the Court hereby enters the following written Findings of Fact and

Conclusions of Law which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## PATENT ISSUES

### FINDINGS OF FACT

The Court's Findings of Fact are based on the Court's independent review of the evidence presented in Neopost's case-in-chief.[1] The Court will not consider extraneous evidence such as the summary charts Neopost submitted after the close of its case-in-chief, which are not evidence in this case.

**I.     Parties**

1.     The Plaintiffs in this action include: Neopost S.A., a corporation based in France, (*Id.* ¶ 5); Neopost Industrie, B.V., a Netherlands corporation, (Jt. Pretrial Order ("Pretrial"), Sch. A ¶ 4); Neopost, Inc., a Delaware corporation (*Id.* ¶ 6); and Hasler, Inc., a Connecticut corporation, (*Id.* ¶ 7).

2.     Neopost is a United States licensee of the '603 Patent, which the United States Patent and Trademark Office ("USPTO") issued on August 23, 1994, and assigned to Hadewe, B.V., of Drachten, Netherlands. ('603 Patent; R. 157, Manbeck Decl. ¶ 13.) The '603 Patent is entitled "Method for Setting a Folding Station Included in an Apparatus for Preparing Items to be Mailed, and Apparatus for Preparing Items to be Mailed and Folding Station Adapted

---

[1]The majority of documents cited in the patent section of this opinion can be found at R. 187, "The Index of Exhibits Supporting Plaintiffs' Response to PFE's Motion for Judgment as a Matter of Law on Patent Non-Infringement," which includes: Minimailer Plus Launch Guide; Minimailer 4 Plus Operating Instructions; Software Code Description; U.S. Patent '603; U.S. Patent '704; Schedule A to the Joint Pretrial Order — Uncontested Facts; Maximailer Operating Instructions; two memoranda regarding the Minimailer software change; declaration of Jan Remijnse; April 26, 2005 Claim Construction Ruling; Minimailer Plus Brochure; and excerpts from David Dronsfield's deposition Raymond George's deposition, David Odhams' deposition, and the trial transcript.

for Carrying out Such Method."

3.      On November 19, 2002, the USPTO issued the '704 Patent, entitled "Setting an Apparatus for Assembling Mail Items." (Pretrial, Sch. A ¶ 11.) Neopost B.V. is the named assignee of the '704 Patent, and Neopost, Inc. and Hasler, Inc. are its exclusive co-licensees. ('704 Patent; R. 157, Manbeck Decl. ¶ 24.)

4.      The Defendants are PFE International, Inc., an Illinois corporation, and PFE International Limited, a company organized under the laws of England. (Pretrial, Sch. A ¶¶ 8-9.)

5.      PFE has sold and continues to sell a product known as the "Minimailer 4 Plus" and a product known as the "Maximailer" within Illinois. (*Id.* ¶ 12.)

## II.    Credibility of the Evidence

6.      Neopost did not offer any expert testimony at trial on the issue of patent infringement.

7.      Neopost offered as evidence of its patent infringement claims: (1) a declaration of Jan Remijnse (R. 160, Remijnse Decl.); (2) portions of the transcripts of deposition testimony by David Dronsfield, Raymond George, and David Odhams (R. 155, Dep. Designations); and (3) certain deposition exhibits that were admitted as trial exhibits by agreement of the parties. (Trial Transcript ("Tr.") at 154.)

8.      Neopost does not identify Dronsfield and Odhams, or provide any description of the scope of these individuals' roles at Neopost or their knowledge of the allegedly infringed patents.[2]

9.      George was the project leader and mechanical design engineer for certain unidentified projects – "D117" and "D114." (R. 155, George Dep. at 154.)

10.    Remijnse, a witness who testified at trial, has worked for Neopost for ten years and currently is a mechanical engineer in Neopost Technologies B.V.'s research and development department. (R. 160, Remijnse Decl. ¶¶ 2-3.)

11.    Remijnse did not read this Court's claim construction in its entirety, and those portions he did read he reviewed three months prior to his testimony. (Tr. at 154.)

12.    The last time Remijnse read the '704 Patent was "a few weeks" before his testimony, and he never read its file history. (Tr. at 154-55.)

13.    Remijnse did not know whether he had ever read the '603 Patent in its entirety, and he had

---

[2] The identification of individuals found in Neopost's trial counsel's opening statement is not evidence. (Tr. at 16.)

not read its complete file history. (Tr. at 155-56.)

## III. The Accused Devices
### A. Facts Common to the Minimailer 4 Plus and the Maximailer

14. The function of the Minimailer 4 Plus and Maximailer "is to feed forms from a hopper, fold them in either 'C', 'Z', 'V' or double forward fold and insert them into an envelope which is then sealed and ejected." (Plaintiffs' Trial Exhibit ("PTX") 179, Minimailer Plus Launch Guide at PFE 000271; PTX 74, Minimailer Op. Instr. at LTD 0010; PTX 75, Maximailer Op. Instr. at LTD 0043; Pretrial, Sch. A ¶ 16.)

15. The Minimailer 4 Plus and Maximailer are devices for assembling mail items from mail components. (PTX 74, Op. Instr. at LTD 0010; PTX 75, Op. Instr. at LTD 0043.)

16. The accused devices include a number of feeder stations. (PTX 74, Op. Instr. at LTD 0012, LTD 0021;PTX 75, Op. Instr. at LTD 0043, 0045, 0046).

17. The Minimailer 4 Plus and the Maximailer require the user to input the fold type; thus this aspect of the setting is not "determined by the apparatus." (Dronsfield Dep. Ex. 18, Software Change Mem. at LTD 0259; Tr. at 175; PTX 179, Launch Guide at PFE 00271.)

18. Both machines incorporate document hoppers, folding stations, and envelope hoppers. (Pretrial, Sch. A ¶ 16; PTX 74, Op. Instr. at LTD 0026, 0031 PTX 75, Op. Instr. at LTD 0045).

19. The Minimailer 4 Plus and Maximailer contain a data processing means that stores programs which set the folding machine. (PTX 74, Op. Instr. at LTD 0010; PTX 75, Op. Instr. at LTD 0043.)

20. The operating instructions for both devices state that the display screens indicate which hoppers are active. (PTX 74, Op. Instr. at LTD 0031; PTX 75, Op. Instr. at LTD 0049.)

### B. The Minimailer 4 Plus

21. The Minimailer "allows the operator to simply load the envelopes and documents into the hoppers, select the fold type, and press start." (PTX 179, Minimailer Plus Series Launch Guide at PFE 00271.)

22. The Minimailer is available with two, three, or four station options. (*Id.* at PFE 00275.)

23. "The operator can . . . load short or long forms into whichever station desired and the machine will automatically configure that application." (*Id.* at PFE 000279.)

24. There are two distinct versions of the Minimailer 4 Plus: the "original" Minimailer 4 Plus and the "modified" Minimailer 4 Plus.

25. The Minimailer 4 Plus's Operating Instructions contain graphics showing that the machine includes both document supply hopper and envelope inserter hoppers. (PTX 74, Minimailer Op. Instr. at LTD 0026.)

26. At or around January 2004, PFE created a modified version of the software used in the Minimailer 4 Plus which included a "[n]ew folding algorithm that does not use the envelope length, the folded length calculation" to determine fold height, but instead bases the fold height on the length of the paper. (Dronsfield Dep. Ex. 16, Software Code Desc. at LTD 0322.) After this change, the fold height determination for folding documents is based on the length of the paper rather than the length of the envelope. (R. 155, Dep. Desig., Odhams Dep. at 134.)

27. The modified Minimailer 4 Plus requires the machine's user to define a fold type before the machine performs its function.[3] (Dronsfield Dep. Ex. 18, Software Change Mem. at LTD 0259; PTX 179, Launch Guide at PFE 00271.)

28. After selecting the fold type, the user presses a "go" button, and the machine measures the envelope and the paper in the hopper on its way into the machine. (R. 155, Odhams Dep. at 132.)

29. If the user selects a fold type that is the wrong size for the height of the envelope being used, the machine indicates that the user should either use another envelope or select another type of fold. (Tr. at 198.)

30. If a hopper becomes empty during processing, depending on the mode of operation, the Minimailer 4 Plus may recognize that and automatically take documents from one of the other hoppers, or pause and wait for user input. (R. 155, Odhams Dep. at 136.)

31. There must be something in the first hopper in order for operations to proceed. (Tr. at 171.)

### C.    The Maximailer

32. The Maximailer does not measure the height of the envelope; rather, that data is input by the operator when programming a job. (Tr. at 174-76.)

33. In response to detecting the presence of a document in at least one of the feeder stations, the Maximailer determines that at least one of the feeder stations is in an operating condition. (*Id.* at 187.)

---

[3]Dronsfield's contradictory deposition testimony that he could "infer" that the user did not have to define a fold type is unreliable, as Dronsfield is unidentified and his inference is baseless. (Dronsfield Dep. at 148).

34. If a tray is loaded, the Maximailer determines that the tray is operable. (*Id.* at 194.)

35. The Operating Instructions for the Maximailer show that it has insert feeders or feed trays that are separate from the envelope hopper. (PTX 75, Maximailer Op. Instr. at LTD 0045.)

## CONCLUSIONS OF LAW

### I.     Legal Standard

1. "If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party[.]" Fed. R. Civ. P. 52(c); *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004).

2. Whether to grant judgment as a matter of law is a procedural issue that is reviewed under the law of the regional circuit in which an appeal from the district court would typically lie; in this case, the regional circuit is Seventh Circuit. *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004).

3. Rule 52(c) "allows the district court to weigh the evidence to determine whether the plaintiff has proven his case." *Ortloff v. United States*, 335 F.3d 652, 660 (7th Cir. 2003). In making a determination under Rule 52(c), "the court is within its prerogative 'to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.'" *Van Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1475 (7th Cir. 1993) (quoting *Sanders v. Gen. Serv. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983)).

4. Whether or not an accused device infringes a patent is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

### II.     Burden of Proof

5. In order to determine whether a patent is infringed, the Court must first determine "the scope and meaning of the patent claims asserted," and then compare the claims to the allegedly infringing device. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1059 (Fed. Cir. 2004). This Court construed all of the disputed claim terms in its April 26, 2005 claim construction ruling. (Apr. 26, 2005 Op. & Order.)

6. In order to establish that a patent has been infringed, a patentee must demonstrate that every limitation of the allegedly infringed patent claims exists in the accused device. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003); *Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). The failure to meet even a single limitation of an allegedly infringed patent claim defeats a claim of infringement. *Rohm & Hass Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

7. Neopost had the burden to prove at trial, by a preponderance of the evidence, that PFE's

Minimailer 4 Plus and Maximailer infringe the '603 and '704 Patents. *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004); *Rohm & Hass Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997). Under the preponderance of the evidence standard, Neopost was required to establish that infringement "was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005). Neopost was required to meet this burden by presenting "more than a mere scintilla of evidence." *Summit Tech., Inc. v. Nidek Co., Ltd.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004); *see also James v. Milw. County*, 956 F.2d 696, 698 (7th Cir. 1992).

8.     A plaintiff in a patent infringement case cannot meet its burden of proof by resting on a witness's summary testimony. Thus, a witness' general opinion that an accused device infringes a patent, standing alone, is insufficient to establish infringement. *Rohm & Hass*, 127 F.3d at 1092 (noting that a district court is not required to accept the unsupported assertions of a witness); *see also Techsearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (stating that "general assertions of facts, general denials, and conclusory statements are insufficient" to support a showing of patent infringement on summary judgment).

9.     In this case, the direct testimony of Remijnse, Neopost's main witness on its patent infringement claims, is almost entirely conclusory in nature. (R. 187, Remijnse Decl.) Instead of describing how the accused devices infringe each claim of PFE's patents, Remijnse simply recites the patent claim language and states that the accused devices incorporate those claim criteria, without explaining how, why, or in what way. (*Id.*) These general and conclusory statements, standing alone, do not establish patent infringement by a preponderance of the evidence. Given Remijnse's limited exposure to the patents in dispute and his conclusory testimony, his testimony on the meaning or scope and infringement of the patents is entitled to limited weight.

10.    At trial, the Court sustained PFE's objection to Remijnse's reference to his September 6 and 7, 2005 inspection of the Minimailer 4 Plus and Maximailer because that testimony was not properly documented or authenticated. (Tr. at 152.)

11.    George is not familiar with how either the Minimailer 4 Plus or the Maximailer operate. (R. 155, George Dep. at 160-61.)

12.    The Court also cannot ascribe Odham's testimony much weight not only because he is not identified, but also because his testimony was based on his uncertain recollection and his acknowledgement of his limited understanding of the Minimailer 4 Plus as "an extremely complex machine and I have to keep it all in my head. . . ." (R. 187, Odham Dep. at 132.)

## III.    Infringement: The '603 Patent

13.    Neopost asserts that the Minimailer 4 Plus infringes claims 1 through 4 and 21 of the '603 Patent, while the Maximailer infringes claims 1 through 3 and 21 of the '603 Patent.

14. Neopost has conceded that there is insufficient evidence to support any infringement claims relating to claims 24, 25, and 31 of the '603 Patent. (R. 184, Pls.' Resp. at 2 n.2.)

### A. Claim 1

15. Claim 1 of the '603 Patent reads as follows: "[a] method for setting a folding station included in an apparatus for preparing items to be mailed, said apparatus comprising a document-supply station, an envelope-inserter station, transport means interconnecting said stations and setting means for setting at least the folding machine, said method comprising the steps of: inputting data into said setting means for setting the fold height of a fold to be formed in at least one document, said data representing at least the height of an envelope intended as a package for said at least one document; and determining and setting said fold height by the setting means, at least partly depending on the inputted data representing the height of the envelope." ('603 Patent, col.17, l.37-50.)

16. On April 26, 2005, this Court entered a claim construction ruling in which the Court adopted the parties' agreed claim construction on several of the terms in claim 1 and independently construed several disputed terms. (Apr. 26, 2005 Op. & Order at 5.) The Court has incorporated these constructions into its findings of whether Neopost has shown that each of the elements of claim 1 is present in the Minimailer 4 Plus and Maximailer.

17. The Court first must determine whether the Minimailer 4 Plus and Maximailer comprise "[a] method for setting a folding station[.]" ('603 Patent, col.17, ln. 37.) The parties agreed that the phrase "setting a folding station" should be construed as: "a folding station folds a document pursuant to a setting determined by the apparatus, which includes the fold type and fold height of the document." (Id.; R. 32, Defs.' claim Constr. Mem., Ex. A.) It is undisputed that both the Minimailer 4 Plus and the Maximailer include a folding station. (Pretrial, Sch. A ¶ 16.) There is insufficient evidence, however, to establish that either the modified Minimailer 4 Plus or the Maximailer incorporates a method whereby the apparatus determines a setting including the fold type and fold height of the document. Both the Minimailer 4 Plus and the Maximailer require the user to input the fold type; thus this aspect of the setting is not "determined by the apparatus." (Dronsfield Dep. Ex. 18, Software Change Mem. at LTD 0259; Tr. at 175; PTX 179, Launch Guide at PFE 00271.)

18. The failure to meet this limitation of claim 1 of the '603 Patent means that Neopost did not meet its burden of proof to show infringement of this claim. The Court need not reach the other limitations of this claim.

### B. Claims 2 Through 4

19. Claims 2 through 4 of the '603 Patent are facially dependent on claim 1.

20. Claim 2 recognizes: "[a] method as claimed in claim 1, wherein said setting means comprises data processing means in which a folding program is stored, and said step of inputting

comprises the step of inputting a parameter value representing the height of an envelope to be processed to said data processing means and said step of determining and setting comprises the step of determining and setting said fold height by said data processing means in accordance with said parameter value." ('603 Patent, col.17, l.51-59.)

21.    Claim 3 recognizes: "[a] method as claimed in claim 1, further comprising the step of inputting data representing the height of the at least one document to be packaged to the setting means and wherein said step of determining and setting comprises the step of determining and setting said fold height by the setting means, partly depending on said inputted data representing the document height." (*Id.* col.17, l.60-66.)

22.    Claim 4 recognizes: "[a] method as claimed in claim 3, wherein said apparatus comprises sensors arranged in the apparatus for preparing items to be mailed and connected to the setting means, and said method further comprises the step of scanning, using said sensors, the height of the at least one document to be packaged; generating a signal that is dependent upon the outcome of the step of scanning and represents the height of the at least one document; and inputting said signal to the setting means." (*Id.* col.17, l.67-68; col.18, l.1-8.)

23.    Because the Court has found that neither the Minimailer 4 Plus nor the Maximailer infringe claim 1, Neopost's infringement claim with respect to dependent claims 2, 3, and 4 must fail as well.

### C.    Claim 21

24.    Neopost asserts that both the Minimailer 4 Plus and the Maximailer infringe claim 21 of the '603 Patent. Claim 21 is an independent claim which recognizes an: "[a]pparatus for preparing items to be mailed, comprising at least one document-supply station, a folding station which can be set for determining a fold height of a fold to be provided in at least one document supplied from the at least one document-supply station, and an envelope inserter station, said stations being interconnected by transport means, and setting means for setting the folding station and comprising input means for inputting at least data which represent the height of an envelope to be processed, the setting means for determining and setting the fold height of said fold, depending on said inputted data."[4] ('603 Patent, col.21, l.14-30.)

25.    Claim 21 requires that data regarding the envelope height must be input into the setting means for determining the fold height.

26.    Neopost has not presented sufficient evidence to show that envelope height must be input to determine fold height in the Maximailer. The only evidence on this issue, Remijnse's testimony on cross-examination, is unhelpful. He testified that the Maximailer "could," but to his knowledge "does not" measure the height of the envelope. (Tr. at 175.) With regard

---

[4] The parties did not dispute the meaning of any of the terms of claim 21, so the Court's prior claim construction ruling of April 26, 2005, does not impact this claim language.

to whether the envelope height must then be input manually, Remijnse speculated that: "I think only input of manual input data by the operator manual could be - - could be input." (*Id.*) Furthermore, Remijnse is not an expert, and his eleventh-hour inspection of the accused devices on the eve of trial was improper and unreliable.

27. With regard to the "modified," post-January 2004 Minimailer 4 Plus, Neopost's evidence establishes that envelope height is not input for the purposes of determining fold height. Rather, the modified Minimailer 4 Plus bases the fold height on the length of the paper. (Dronsfield Dep. Ex. 16, Software Code Desc. at LTD 0322; R. 155, Dep. Desig., Odhams Dep. at 134.)

28. In addition, Neopost has not presented sufficient evidence to show that envelope height must be input to determine fold height in the "original," pre-January 2004, Minimailer. The only evidence of inputting envelope height in the original Minimailer 4 Plus comes from an unidentified exhibit to an unidentified person's deposition. In Exhibit 14 to Dronsfield's deposition testimony, he identified a document discussing the Minimailer software change allegedly authored by an unidentified person, Bob Iddon. (Dronsfield Dep. Ex. 14, Software Code Desc. at LTD 255.) The document states that: "[w]hilst we will still measure envelope length and use the data for setting envelope functions, with reference to folding, the env [*sic*] length can only be used to indicate that PH [pack height] is incorrect." (Ex. 10, Memo Re: Software Change at LTD 0255.) Although this document seems to imply that envelope height may have originally been used in determining fold height, there is no foundation whatsoever for the document: it does not state the author, recipient, subject, date, whether it is a draft or final copy, or any other surrounding circumstances. In fact, in his deposition, Dronsfield states that he does not even understand the algorithm displayed in Exhibit 14. (Dronsfield Dep. at 133.) Thus, Neopost has not established that the original Minimailer 4 Plus infringes claim 21 of the '603 Patent.

## IV. Infringement: The '704 Patent

29. Neopost contends that the original and modified Minimailer 4 Plus infringe claims 1 through 11 of the '704 Patent, and that the Maximailer infringes claims 1 through 4 and 6 through 11 of the '704 Patent.[5] (R. 184, Pls.' Resp. at 10.)

### A. Claim 1

30. Claim 1 of the '704 Patent reads: "[a] method for determining a setting condition of an apparatus for assembling mail items from mail components, wherein the apparatus includes a number of feeder stations, the method comprising detecting, in a setting phase, in which of the feeder stations the mail components are present, in response to detecting during said

---

[5]PFE's argument that the '704 Patent is invalid because it is anticipated by prior art will not be considered at this stage of the proceedings, at the close of Neopost's case-in-chief, where the issue is whether PFE has established a *prima facie* case of infringement of the '704 Patent. (Tr. at 170-71; R. 176, Revised Findings & Concl. ¶¶ 40-53.)

setting phase the presence of at least one mail component in at least one of said feeder stations, in the setting condition determined by the apparatus, said at least one of said feeder stations is in a non-operating condition, and in response to not detecting during said setting phase the presence of at least one of the mail components in another of said feeder stations, said another of said feeder stations is in a non-operating condition." ('704 Patent, col.8, l.14-28.)

31.   This Court construed the term "a setting condition" as "the condition that the apparatus is in based upon the determination of which feeder stations contain a mail component." (Apr. 26, 2005 Op. & Order at 16-17.) Neopost has not presented sufficient evidence of a method for determining a setting condition in the Minimailer 4 Plus. In his deposition, Odhams equivocated that when the machine is in "Stack 'n' Go" mode and detects a lack of paper in a hopper, it will either carry on without anything in that hopper *or* pause and wait for user input. (R. 155, Odhams Dep. at 136, 139.) In addition, Odhams was unsure whether the machine identifies the empty hopper or full hopper to the user. (*Id.* at 137.) The Minimailer 4 Plus Operating Instructions do not clarify this issue. The instructions contain an image titled "Run Stack 'n' Go" showing a document with an arrow pointing to a document hopper. (PTX 74, Op. Instr. at LTD 0022). This information does not establish that the Stack 'n' Go condition or any other condition of the Minimailer 4 Plus is based upon a determination of whether feeder stations contain a mail component.

32.   Neither has Neopost presented evidence of a setting condition in the Maximailer. The Operating Instructions display a graphic called "Run Job" and state that the "graphic indicates which hoppers are active, and whether a folded document or an insert." (PTX 75, Op. Instr. at LTD 0049.) This evidence is insufficient to establish that the Minimailer 4 Plus and Maximailer include "a method for determining a setting condition."

33.   Although Neopost may have presented sufficient evidence of other limitations in claim 1,[6] Neopost cannot show infringement of claim 1 because Neopost did not present sufficient

---

[6] Neopost has shown that the Minimailer 4 Plus and the Maximailer are devices for assembling mail items from mail components and that they contain a number of feeder stations. (PTX 74, Op. Instr. at LTD 0010-12; PTX 75, Op. Instr. at LTD 0043-46.) However, Remijnse's and Odhams' testimony as to the other limitations in claim 1 likely would not be sufficient to support a finding of infringement. While their testimony could be construed to mean that the devices automatically sense when a hopper is empty and, as a result, that the hopper is in a non-operating condition, Remijnse's and Odhams are not experts in these matters, and Remijnse's eleventh-hour inspection of the accused devices on the eve of trial was improper and unreliable.. (Tr. at 171, 193-97; R. 155, Odhams Dep. at 136.) While the devices' operating instructions may support a finding that the feeder stations are in an operating condition in response to detecting during the setting phase the presence of a mail component, the instructions are silent as to the remaining limitations in claim 1. (Tr. at 194; PTX 74, Op. Instr. at LTD 0031; PTX 75, Op. Instr. at LTD 0049.)

evidence of a method for determining a setting condition in the Minimailer or Maximailer. *See Oakley*, 316 F.3d at 1339.

34.    As a finding of infringement of claims 2 through 5 are dependent on Neopost's failed claim 1, the Court must find that the Minimailer 4 Plus and the Maximailer also do not infringe claims 2 through 5 of the '704 Patent. *See* '704 Patent, col.8, l.29-50 (each claim begins with the phrase "[a] method according to claim 1.")

35.    Even if Neopost had shown sufficient evidence to support a finding of infringement of claim 1, its allegations of infringement of claims 3 and 5 would still fail. Claim 3 requires, among other things, that the accused devices "detect downstream" from an empty feeder station whether a mail component has passed by. Rather than presenting evidence of this, Neopost apparently expects the Court to guess from the operating instructions that this is how the machines function. This is insufficient for Neopost to meet its burden of proof on this issue. As for claim 5, the record is devoid of the required evidence establishing that the method used in the devices includes a further setting that depends on a feeder station being in operating condition.

### B.    Claim 6

36.    Neopost asserts that both the Minimailer 4 Plus and the Maximailer infringe claim 6 of the '704 Patent, which reads as follows: "[a]n apparatus for assembling mail items from mail components, comprising: a number of feeder stations for feeding mail components to be processed into mail items, means for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus, a control unite for determining, in response to said actual data, at least one setting of the apparatus, detection means coupled with said control unit for detecting in a setting phase in which of said feeder stations the mail components are present, wherein said setting condition of the apparatus at least one of said feeder stations is in an operating condition in response to the detected presence of at least one mail component in said at least one of said feeder stations, and, in response to a non-detection of the presence of at least one of the mail components in another of said feeder stations, said another of said feeder stations is in a non-operating condition." ('704 Patent, col.8, l.52-67 and col.9, l.1-4.)

37.    Neopost has shown that the Minimailer 4 Plus and the Maximailer incorporate the first two limitations of claim 6. They are both devices for assembling mail items from mail

---

[7]Even if Neopost had presented sufficient evidence to establish infringement of claim 1, its scant evidence of infringement of claims 2 and 4 was not sufficient to meet its burden of proof. Although Remijnse testified that the Minimailer 4 Plus and the Maximailer detect when a tray is in operating condition, and indicated that a tray should be re-loaded when it becomes empty, Remijnse was not established as an expert in these matters, and his eleventh-hour inspection of the accused devices on the eve of trial was improper and unreliable. (Tr. at 194, 197; PTX 74, Op. Instr. at LTD 0031; PTX 75, Op. Instr. at LTD 0049.)

components using a number of feeder stations to feed those mail components. (*See* PTX 179, Minimailer Plus Launch Guide at PFE 000271, 00275; PTX 75, Maximailer Op. Instruc. at LTD 0043, 0045-46; Pretrial. Sch. A ¶ 15.)

38. The next element of claim 6 comprises a "means for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus[.]" ('704 Patent, col.8, l.56-57.) In the Court's claim construction ruling, the Court construed this to mean: "(1) a light source and photosensitive cell that can be connected to a data processor for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus; (2) a scanning roller that can be connected to a data processor for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus; (3) a scanner for scanning indicia present on the documents connected to a data processor for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus; (4) a thickness meter connected to a data processor for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus; and (5) any equivalent structures for detecting actual data regarding the mail components loaded into the feeder stations of the apparatus." (Apr. 16, 2005 Op. & Order at 18-19.)

39. The record is devoid of evidence—beyond Remijnse's utterly conclusory declaration—that any of the specific structures listed in the claim construction, or equivalent structures, exist in either the Minimailer 4 Plus or the Maximailer. As a result, Neopost has not shown that either of the accused devices infringes claim 6 of the '704 Patent.

**C.  Claims 7 through 11**

40. Claims 7 through 9 require "[a]n apparatus according to claim 6," claim 10 requires "[a]n apparatus according to claim 9," and claim 11 requires "[a]n apparatus according to claim 10." ('704 Patent, col.9, l.5-17; col.10, l.1-15.) As a finding of infringement of claims 7 through 11 are all ultimately dependent on Neopost's failed claim 6, the Court must find that Neopost has also not shown that the Minimailer 4 Plus and the Maximailer infringe claims 7 through 11 of the '704 Patent.

**V.  Ruling on Patent Claims**

Neopost has failed to carry its burden of proof on each and every one of its patent claims

against PFE. Not only did Neopost fail to secure expert testimony in support of its claims, but the

testimony that Neopost did present was speculative, lacking in foundation, and biased in favor of

Neopost. After carefully reviewing all of the evidence that Neopost presented in its case-in-chief

in the liability portion of this trial, the Court grants PFE's Rule 52(c) motion for judgment as a

matter of law with respect to all of Neopost's patent claims.

# TRADEMARK CLAIMS

In Counts III through XI of the Second Amended Complaint, Neopost alleges: (1) trademark infringement and false designation of origin under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.* ("Lanham Act"); (2) common law trademark infringement; and (3) violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2(a).

## FINDINGS OF FACT

As explained above, the Court's findings of fact are based on the Court's independent review of the evidence presented in Neopost's case-in-chief.[8] The Court will not consider extraneous documents submitted after the close of Neopost's case-in-chief, such as PFE's USPTO search of "'n go," which PFE attached to its Motion for Judgment as a Matter of Law. This document is not evidence in this case, as the Court's decision rests on whether Neopost presented sufficient evidence at trial to sustain its claims of trademark infringement against PFE.

The Court's findings of fact above also apply to the trademark discussion below. The Court also makes these additional findings of fact as to the trademark issues in this case.

## I. Parties/Credibility of the Evidence

1.  Carl Amacker is employed by Mailroom Services, Inc. as the Vice President of Postage Finance. Neopost, Inc., Neopost, S.A., Neopost B.V., Hasler, Inc. and Mailroom Services, Inc., are companies under common ownership and control. As part of his duties, Amacker

---

[8] The majority of documents cited to in the trademark section of this opinion can be found at R. 186, "Evidence Cited in Plaintiffs' Opposition to Defendants' Motion for Judgment on Trademark Claims," including: Declaration of Carl Amacker; deposition excerpts of Raymond George; excerpts of trial transcript; Load 'N Go, Mix 'N Go, and 'N Neopost trademark registration and mark; SI 72 Office Mailer Folder Inserter brochure; SI 62 Desktop Folder Inserter brochure; SI 68 EZ Mailer 3 Folder Inserter brochure; SI 76 Table-top Folder Inserter brochure; SI 76 press release; Prestigious iF Award press release; Los Angeles County improvements press release; SI 62 press release; SI 82 press release; Make a Wish press release; marketing memorandum; Minimailer 4 Plus operating instructions; Maximailer operating instructions; Minimailer Plus brochure; PFE advertisement; Minimailer Plus series launch guide

is responsible for postage finance options as it relates to Neopost's postage meter business in the United States. (Amacker Decl. ¶¶ 2, 7.)

2. Previously, Amacker served as Neopost, Inc.'s, Vice President of Direct Sales, where he was responsible for direct sales of Neopost hardware products in the U.S. He has also served as Vice President of Marketing. (Amacker Decl. ¶¶ 8-9.)

3. As a result of his experience at Mailroom Services and Neopost, Amacker claims to be "intimately aware of many details of the business operations of the Plaintiffs in the above captioned matter with particular emphasis on sales." (Amacker Decl. ¶ 12.)

4. Amacker has not been qualified as an expert in this case.

## II. Neopost's Marks

5. Neopost owns the federally registered trademarks: Load 'N Go; Mix 'N Go; and N Neopost. (PTX 7, "Load 'N Go" trademark registration and mark; PTX 8, "Mix 'N Go" trademark registration and mark; PTX 9, "N Neopost" trademark registration and mark.)

6. Each of these trademarks uses a distinctive stylized letter N, known as the "Flying N." (PTX 7, 8, 9; Tr. at 67-68.[9])

7. The trademark principal register for the Mix 'N Go mark specifies that it consists of a stylized form of the words Mix 'N Go lined for the color blue. (PTX 8; Tr. at 67-68.)

8. The trademark principal register for the N Neopost mark specifies that it consists of a stylized letter "N" lined for the colors blue and silver. (PTX 9; Tr. at 68.)

9. The trademark principal register for the Load 'N Go mark incorporates the flying N. (PTX 7; Tr. at 68.)

10. Neopost's marks are used "in connection with" a feature of certain automated mailers covered by the '704 Patent. (Amacker Decl. ¶ 46.) This feature "detects which paper feeders have paper, then automatically adjusts settings such as fold type, fold length, envelope size and paper length." (Id. ¶ 47; PTX 179, Minimailer Plus Series Launch Guide, at 12-13.)

11. Neopost markets its Load 'N Go and Mix 'N Go products primarily using the stylized "N." (Tr. at 107; PTX 55, 56, 58, 59.)

12. Neopost used the standard character of "Load 'N Go" in at least six, undated press releases.

---

[9]All of the cites to trial testimony in this section are to Amacker's testimony at trial.

(PTX 60-65.[10])

13. Amacker testified that Neopost uses non-stylized versions of its marks "all the time." (Tr. at 67.)

14. Neopost did not provide any consumer testimony, consumer surveys, or expert testimony to demonstrate that its standard character marks are suggestive.

## III. PFE's Marks

15. PFE sells folder inserter machines in competition with Neopost, including the Minimailer 4 Plus and the Maximailer. (Amacker Decl. ¶¶ 55, 56, 61.)

16. PFE uses the "Stack 'n' Go" and "Select 'n' Go" marks.

17. PFE's marks were developed by Raymond George, the managing director of PFE Limited, with assistance from David Carter and Richard George. (George Dep. at 146-147, 149.)

18. PFE's Stack 'n' Go and Select 'n' Go marks are in standard character lower case texts. (Tr. at 71-72; PTX 75, Maximailer operating instructions; PTX 169, Minimailer Plus brochure.)

19. Neither of PFE's marks incorporate the Flying N, the color blue of Neopost's "Mix 'N Go," or the lined blue and silver colors of "N Neopost." (Tr. at 71-72.)

## IV. Marketing of Marks

20. Neopost has advertised its products with the stylized N in "printed publications, including newspapers and periodicals, magazines, Internet websites and point of sale materials," as well as press releases. (Amacker Decl. ¶¶ 42-43; PTX 60-65.)

21. Neopost has used the marks Load 'N Go, Mix 'N Go, and N Neopost in commerce to promote its mail assembly and processing products, including its folder inserter machines. (Amacker Decl. ¶¶ 30-34, 42, 45, 48; PTX 60-65; PTX 55, 56, 58, 59.[11])

22. Neopost has used the Load 'N Go mark since at least 2000 to identify and describe an automated feature of Neopost's folder inserter machines that allows a user to load documents and run an application at the touch of a button. (PTX 55, 56, 58, 59.)

23. PFE has marketed "Stack 'n' Go" in connection with the sale of the Minimailer 4 Plus, and "Select 'n' Go" in connection with the sale of the Maximailer, by placing the mark on advertising, packaging, internet websites and point of sale material. (Amacker Decl. ¶¶ 55-

---

[10]Neopost's trial exhibits 60 through 65 consist of various Neopost press releases.

[11]Neopost's trial exhibits 55, 56, 58, and 59 consist of Neopost brochures for its products.

57, 61; PTX 74, Minimailer 4 Plus operating instructions; PTX 75, Maximailer operating instructions; PTX 169, Minimailer 4 Plus brochure; PTX 171, PFE advertisement.)

24. Neopost uses the stylized, flying N in the majority of its marketing materials. (Tr. at 107.)

## V. Channels of Trade

25. Neopost and PFE sell their own products through direct sales and independent dealers. (Tr. at 97-98.)

26. Neopost's direct sales are made by Neopost employees, identifying themselves as such, through direct sales outlets, phone solicitation or sales in the field. (*Id.*)

27. Approximately 150 independent dealers sell Neopost brand and/or Hasler brand folder inserters. (Tr. at 99.)

28. Independent dealers have the option of selling competing companies' products. (Tr. at 99.)

29. No United States dealer sells Neopost brand machines alongside PFE's Minimailer 4 Plus or Maximailer machines. (Tr. at 88.)

30. The instances of dealers selling Hasler branded machines alongside Minimailer 4 Plus and Maximailer machines are "de minimis;" however, these machines do not use the stylized "N." (Tr. at 84-85, 87.)

## CONCLUSIONS OF LAW

1. To prove a *prima facie* case of trademark infringement, a plaintiff must show that: (1) the plaintiff's marks are distinctive enough to be worthy of protection; and (2) the defendant's use of its trademarks is likely to cause customers to be confused as to the origin of the products. *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 496-97 (7th Cir. 2001).

2. Trademark infringement cases under Illinois law are analyzed under the same legal standard as the Lanham Act. *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982); *Tarin v. Pellonari*, 253 Ill. App. 3d 542, 551, 625 N.E.2d 739, 745-46 (1st Dist. 1993).

3. "Under the Lanham Act § 43(a), the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. . . . Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical--is there a likelihood of confusion?" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (internal citations omitted).

4. To prove a violation of the Illinois Uniform Deceptive Trade Practices Act, the plaintiff must also show a "likelihood of confusion or of misunderstanding" as to the source, sponsorship, approval, or certification of goods or services; or as to affiliation, connection, or association

with or certification by another. 815 ILCS § 510/2(a).

# I. Scope and Distinctiveness of Neopost's Registered Trademarks
## A. Stylized "N"

5. Neopost concedes that its marks — Load 'N Go; Mix 'N Go; and N Neopost – are registered in stylized form, with the "Flying N." (PTX 7, 8, 9; R. 185, Neopost Oppos. Br. at 1.)

6. PFE admits that Neopost's registered trademarks incorporate the stylized "N." (R. 178, PFE Br. at 2-3.)

7. Federal registration of a trademark is *prima facie* proof that the registered mark is valid. 15 U.S.C. § 1057(b).

8. "The registration of a trademark does not confer upon that mark a presumption of nondescriptiveness. . . ." *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 746 F.2d 375, 379 (7th Cir. 1984). "The defendant may overcome this presumption with evidence that the mark is merely generic or descriptive, or that it lacks secondary meaning." *Id.*

9. The Court finds that at the close of Neopost's case-in-chief, the registration of the stylized form of Neopost's trademarks sufficiently demonstrates that the trademarks, containing the stylized N, are entitled to trademark protection.

## B. Standard Character Form

10. Neopost admits that the presumption of trademark validity provided by registration should not be extended to the non-stylized versions of the registered marks. (R. 185, Neopost Oppos. Br. at 6.)

11. When a trade name or mark is not registered with the USPTO, the burden is on the claimant, Neopost, to establish trademark protection. *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998) (citations omitted).

12. Neopost has not provided any evidence that it used the standard character form of Mix 'N Go or 'N Neopost in commerce. Thus, Neopost cannot establish that it is entitled to trademark protection as to the standard forms of these marks.

13. Absent registration, trademark protection may be established by demonstrating a mark's distinctiveness. "[T]here are various categories of terms and words that are entitled to trademark protection when consumers rely on those marks to identify and distinguish one company's goods or services from those of its competitors. Marks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Platinum*, 149 F.3d at 727.

### 1. Suggestive Marks

14. Suggestive marks are inherently distinctive. *Platinum*, 149 F.3d at 727. A suggestive mark must do more than describe a function of a product. It must stand for an idea which requires some operation of the imagination to connect it with the goods. *Union Carbide Corp. v. Ever-Ready Inc.*, 537 F.2d 366, 379 (7th Cir. 1976).

15. Neopost argues that the Load 'N Go standard character form is suggestive because it does not merely describe a function or attribute of Neopost's products, but rather "suggests a benefit of purchasing Neopost's machines." (R. 185, Neopost Oppos. Br. at 8.)

16. However, Neopost provides no evidence of this suggestive characteristic of its Load 'N Go mark. In many of the promotional brochure and press release admitted at trial, the Load 'N Go feature was described almost exactly as the mark implies: enabling a user to "just load the material and go" (PTX 55; Tr. at 73); "just load the documents, press start and walk away" (PTX 56, 59); "just load the material, touch the button, and go" (PTX 58, 63.) "Simply load the documents into the SI 82, press Load 'N Go and the SI 82 will do the rest. Several of these advertisements also explained, in more detail, that the Load 'N Go "automatically detects which feeders have paper, then adjusts settings such as fold type, fold length, envelope size, paper length and paper thickness." (PTX 64: press release.) It is clear that the key defining phrase in the advertisement is to "load the material and go."

17. In addition, Neopost has not provided any consumer testimony, consumer surveys, or expert testimony to demonstrate that its standard character marks are suggestive. Although such evidence is not required to demonstrate infringement, when Neopost's evidence is examined in its totality, "there is no indication that the public has come to associate plaintiff's name with its business or reputation." *See Platinum*, 149 F.3d at 728-29.

18. Furthermore, a mark cannot be inherently distinctive if the mark is widely used in the industry. In *Platinum*, the Seventh Circuit held that the word "platinum" is descriptive rather than suggestive in the financial-services industry because, functionally, "so many firms use the word for financial products, it cannot be inherently distinctive" and must go in the descriptive category. *Bliss*, 268 F.3d at 497 (discussing its holding in *Platinum*); *see Platinum*, 149 F.3d at 730. Likewise, in *Bliss*, the Seventh Circuit held that "BLISS" marks are a "glut on the market in hair styling and beauty care" and thus are not distinctive. *Bliss*, 268 F.3d at 497. In the instant case, however, there is no evidence in the record as to whether the standard form of the Load 'N Go mark, or at least the "'N go" mark, are widely used. PFE's USPTO "n go" search, attached to PFE's judgment as a matter of law pleadings, is not part of Neopost's case-in-chief, and thus the Court will not consider it at this time.

17. A party seeking to establish trademark protection must also show that it was the first to use the mark, and that it used the mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999) (internal citations omitted). Neopost has not provided evidence that it was the first to use the

standard form of the Load 'N Go mark, but merely pointed to an advertisement dating from 2000.

18. To gain trademark protection, the party must further show that it actively used the mark. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). Neopost has failed here as well, as besides the conclusory testimony by Amacker that the standard form of the Load 'N Go mark was used "all the time," the brochures and press releases Neopost produced to show "active use," actually show no such thing. First, none of the press releases even contain a date. Second, there is no indication as to where, when or how often Neopost used the brochures it cited in its opposition brief. By themselves, the brochures, which are sporadically dated January 2000, February 2001, May 2004, and October 2004, do not demonstrate that Neopost actively used the standard form of Load 'N Go.

19. "For the purpose of establishing public identification of a mark with a product or service, the fact-finder may rely on the use of the mark in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications." *Johnny Blastoff,*, 188 F.3d at 434 (internal citations omitted).

20. The Court has considered all of the evidence submitted by Neopost in its case-in-chief, and finds that Neopost has not carried its burden to show that the standard form of its Load 'N Go mark is suggestive.

### 2. Descriptive Marks

21. Descriptive marks are entitled to trademark protection if they have acquired secondary meaning. *Platinum*, 149 F.3d at 727. To demonstrate secondary meaning, a person unaware of the particular product or manufacturer must be able to identify the product to which the mark might be applied upon seeing or hearing the name. *Indep. Nail & Packaging Co., Inc. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921, 926 (7th Cir. 1953).

22. Neopost claims that even if its marks are merely descriptive, they are entitled to trademark protection because they have acquired secondary meaning. This argument, however, is a nonstarter, as Neopost's counsel stipulated at trial that there is "no evidence of secondary meaning." (Tr. at 229.)

23. As trademark infringement and false designation of origin under the Lanham Act, as well as common law trademark infringement, are analyzed under the same standard, the Court finds that these claims fail because Neopost has not met its burden of showing the scope and distinctiveness of the standard character form of the trademarks.

### II. Likelihood of Confusion

24. Nevertheless, even if Neopost had satisfied its burden of demonstrating distinctiveness of its standard character marks, all of Neopost's claims - including those regarding the stylized N fail under the likelihood of confusion test. Each of Neopost's trademark claims, including its claim of violation of the Illinois Uniform Deceptive Trade Practices Act, ultimately rest

on the likelihood of confusion test.

25.  If the mark is sufficiently distinctive to warrant trademark protection, the plaintiff must then prove that the defendant's use of the mark is likely to cause confusion. *EZ Loader*, 746 F.2d at 379 (citing 15 U.S.C. § 1114(1)(a)).

26.  Neopost has not shown that PFE's use of their trademarks is likely to cause customers to be confused as to the origin of the products. Seven factors comprise the likelihood of confusion test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm off his product as that of another." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000) (citations omitted).

27.  The likelihood of confusion test is an equitable balancing test. *Id.* at 1044. While no single factor is dispositive, three factors are "particularly important:" the similarity of the marks, the defendant's intent, and actual confusion. *Id.*

28.  Neopost concedes that it presented no evidence regarding three of these seven factors, two of which are "particularly important:" (1) the degree of care exercised by consumers in the relevant market, which, in fact, is "relatively high" (Tr. at 29-30); (2) actual confusion (Tr. at 21-22); and (3) intent to palm off. (Tr. at 31.)

### A.  Similarity Between Marks in Appearance and Suggestion

29.  Both Neopost's and PFE's marks use of the phrase "'n go," but PFE only uses the phrase in standard character lower-case text. (Tr. at 70-72; PTX 75, 169.)

30.  In determining whether two marks are similar, the comparison is made "in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) (citations omitted). However, different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion. *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001).

31.  While the products share the phrase, "n go," when looking at the likelihood of confusion "in light of what happens in the marketplace," this factor does not help Neopost. Neopost itself admits that it has no evidence of actual confusion in the marketplace, and Amacker also is not aware of any consumer confusion. (Tr. at 21-22; 101-102, 114.)

### B.  Similarity of Products

32.  PFE concedes that Neopost has presented sufficient evidence that the function and pricing of PFE's products are similar to those of Neopost. (Oppos. Br. at 12.) Both Neopost and PFE manufacture, distribute and sell mail assembly and processing machines. (Amacker Decl. ¶ 54.) This factor weighs in favor of Neopost's trademark infringement claim.

## C.    Area and Manner of Concurrent Use

33.    When assessing this factor, courts look to see "whether there is a relationship between the use, promotion, distribution or sales between the goods or services of the parties." *CAE, Inc. v. Clean Air Eng'g. Inc.*, 267 F.3d 660, 681 (7th Cir. 2001) (citations omitted).  The court looks to whether the parties used same channels of commerce, targeted the same general audience, and/or used similar marketing procedures.  *Id*; *see also Ty*, 237 F.3d at 901 (holding that the area of concurrent use overlapped when the parties sold their products in the same stores, advertised in the same magazines, and targeted the same general audience). In *CAE*, the parties advertised in the same trade journals and trade shows, and they sold their goods and services to many of the same companies and entities.  *CAE*, 267 F.3d at 682. Likewise, in *Am. Soc'y of Plumbing Eng'rs v. TMB Pub., Inc.*, the Seventh Circuit found it important that the parties advertised in the same publications, which targeted the same, rather limited audience. Nos. 02-3632, 02-3756, 2004 WL 1799362, at *8 (7th Cir. Aug. 3, 2004).

34.    At most, Neopost has provided evidence that Neopost and PFE target the same customers (small to mid-size companies engaged in mass mailing), and market and sell their products through the same *types of* channels: direct sales, independent dealers, and trade shows; not that the products went through the same channels.  (Tr. at 97-98; Amacker Decl. ¶¶ 69, 72.) Neopost and PFE products may have been sold at the same trade shows, but Amacker has never heard of consumer confusion at the trade shows.  (Tr. at 114, 101-102.)

35.    Although Amacker testified that "the parties advertise their mail assembly machines in the same publications," Neopost has not provided evidence showing what publications, if any, either parties advertise in, or what products or trademarks were the subjects of those alleged advertisements.  (Amacker Decl. ¶ 171.)  Nor does Amacker specify where, when, or how frequently Neopost or PFE advertised their marks or products.

36.    Amacker also had no knowledge of what PFE salesmen were doing in the marketplace and whether they promote the Stack 'n' Go or Select 'n' Go features.  (Tr. at 120-21.)

37.    Although Neopost's and PFE's area and manner of use are concurrent in some aspects, this factor weighs only slightly, if at all, in favor of Neopost's infringement claims.  In cases such as *CAE*, *Ty*, and *TMB*, the similarities in area and manner of use were much greater than in this case, where consumers never even see the products side by side.

## D.    Strength of Neopost's Mark

38.    The strength of a mark is determined by its distinctiveness and the extent to which the mark has been promoted.  *CAE*, 267 F.3d at 684-85.  The more use and promotion of similar marks by third parties, the weaker the mark and less protection afforded.  *TMB*, 2004 WL 1799362, at *8.

39.    Neopost rarely promotes the standard character form of its marks, and, as explained above, Neopost has not demonstrated that the standard character form of its marks is sufficiently

distinct.

40. There is also little or no evidence as to the strength of the stylized form of the marks, outside of the fact that the stylized marks are registered, which leads to a presumption of distinctiveness. Neopost's counsel stipulated that there is "no evidence of secondary meaning." (Tr. at 229.)

41. Amacker's declaration that the "relevant market has come to associate [Neopost's marks] with the Neopost Companies," without any documentary or survey support, does not carry Neopost's burden in trial to show the strength of the mark. (Amacker Decl. ¶ 35.) Amacker is not an expert, but merely presumes that Neopost's use of the stylized mark on many of its products must mean the relevant market is aware of the ownership of the mark.

42. Neopost has not provided any consumer testimony, consumer surveys, or expert testimony to demonstrate that its marks are strong. Although such evidence is not required to demonstrate infringement, when Neopost's evidence is examined in its totality, "there is no indication that the public has come to associate plaintiff's name with its business or reputation." See *Platinum*, 149 F.3d at 728-29.

43. However, even if the registration of the marks and Amacker's self-serving testimony were enough to show the strength of Neopost's stylized marks, they are not enough to outweigh the failure of proof in at least four other likelihood of confusion factors.

## III.   RULING ON TRADEMARK CLAIMS

At most, Neopost has shown that its stylized, registered trademarks are distinctive. With only one factor of the seven-factor likelihood of confusion test weighing solidly in Neopost's favor – the similarity of the products   Neopost has not sustained its burden of proof that PFE infringed its trademarks. Although the marks may be slightly similar in appearance, and although the products may have some overlap in area and manner of use, there is a lack of evidence that consumers are even aware of the marks, let alone confused by them. Therefore, Neopost's trademark claims fails.

## CONCLUSION

Despite being given adequate time to properly prepare for trial, Neopost's efforts fell far short of the threshold required to meet its burden of proof. Simply put, Neopost's efforts to prove liability were doomed by its failure to provide adequate proof in support of its claims. Neopost's failure to

23

supply the Court with any credible expert testimony or survey evidence in support of its claims is particularly troubling in light of the issues involved in this case. For the reasons set forth above, the Court finds that Neopost has not submitted sufficient evidence to prove any of its claims against PFE. Accordingly, PFE's motions for judgment as a matter of law on Neopost's patent and trademark claims are GRANTED. (R. 174, 177.) The Clerk of the Court is instructed to enter final judgment in favor of PFE on all claims brought by Neopost in this litigation.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** December 5, 2005